In re Héctor González Blanes, Respondent.

No. 61. Submitted July 10, 1945.—Decided November 15, 1945.

358

*José A. Poventud, Jorge L. Córdova,* and *José López Baralt* for respondent. *Luis Negrón Fernández, Assistant Prosecuting Attorney,* for The People.

Mr. Justice de Jesús delivered the opinion of the court.

The Assistant *Fiscal* of this court filed and prosecuted, by order of this court,[1] a petition for disbarment against Attorney Héctor González Blanes. The petition substantially alleges that in case No. R–1931, which is a civil action instituted in the District Court of San Juan by Luisa Boix Domínguez et al., v. Insular Board of Elections, the respondent, as Attorney of the Partido Unión Republicano Progresista, intervener in said suit, filed a motion on May 9, 1944, which reads thus:

"Motion seeking the annulment of transfer of Judge Emilio S. Belaval to act as Judge of the District Court of San Juan and seeking his disqualification to act in these proceedings

"Now comes the intervener, Partido Unión Republicano Progresista, and respectfully alleges and prays:

"1. That at the time of the filing of the above-entitled case, that is, on April 24, 1944, this Honorable Court was composed of its regular judges: Hon. Marcelino Romany, Hon. Ricardo La Costa, Jr., and R. Cordovés Arana; and Hon. Domingo Massari, Judge at Large, acted in substitution of Hon. Jorge L. Córdova Díaz.

"2. That the alleged petitioners in the present action seek a judgment declaring valid a number of petitions for registration of which about 50,000 are alleged to belong to prospective voters for the Partido Popular Democrático.

"3. That an action substantially identical with the present one, wherein petitioners sought their inclusion in the register of new voters of Puerto Rico, was dismissed by the Supreme

---

[1] The *Fiscal* of this court disqualified himself to file the complaint, whereupon we issued an order to the Assistant *Fiscal* to present and prosecute the charge.

Court, it now being their intention in the proceeding herein to circumvent the judgment rendered by the Supreme Court of Puerto Rico.

"4. That pursuant to the rules of this Court it was incumbent on Judge Domingo Massari to sit in this and six other identical cases, filed for the same purpose, to have illegal petitions for registration declared valid, which had been rejected by the Insular Board of Elections.

"5. That the Governor of Puerto Rico is acting as a conspicuous leader of the Partido Popular Democrático, and as such, is interested in favoring this Party in the outcome of the elections and in the outcome of the present suit, which has been prepared and prosecuted by prominent leaders of said Partido Popular to enable persons who do not fill the statutory requirements to vote in the coming elections, thus facilitating the commission of an electoral fraud.

"6. That since the adverse judgment rendered by the Supreme Court, the Governor of Puerto Rico has performed illegal acts in order to defeat the legal acts of the Insular Board of Elections and the effect of the judgment rendered by our highest tribunal, for the benefit of his party and in detriment to the political leaders who have been attacking his actions as Governor; and to that end, taking advantage of the circumstance that two vacancies had occurred in the Insular Board of Elections, he filled both vacancies by appointing Gustavo Cruzado Silva and Ernesto Mieres Calimano to act as representatives of the Partido Liberal, which is one of the four principal political parties of Puerto Rico, taking into consideration only a letter of José Ramírez Santibáñez, President of said party at that time, and disregarding, in gross violation of law, the recommendation made by the Central Board of the Partido Liberal.

"7. That upon this matter being taken to the Supreme Court of Puerto Rico by Luis Archilla Laugier and José Enrique Gelpí, who were the persons recommended by the Central Board of the Partido Liberal, and who were the ones

entitled to fill said vacancies, the Supreme Court annulled the illegal action of the Governor and ordered the appointment of said gentlemen as members of the Insular Board of Elections.

"8. That it was a matter of public knowledge that the real and authentic representatives of the Partido Liberal in the Insular Board of Elections, as members of said Board, formally opposed, as they officially did oppose and still oppose, the acceptance of said petitions for registration, because in their opinion they are entirely null and void.

"9. That ever since the Governor of Puerto Rico, in co-operation with the leaders of the Partido Popular Democrático, has used and continues to use his position as Governor of Puerto Rico to thwart the effect of the ruling of the Insular Board of Elections, and the judgment rendered by the Supreme Court of Puerto Rico in *Benjamín Cruz et al.* v. *Insular Board of Elections,* and to that end he has used his position as Governor to make the following unusual changes and transfers:

"10. That the Governor of Puerto Rico, upon the filing of this suit in the District Court of San Juan, without any need therefor, transferred Judge Emilio Belaval—who is affiliated with the Partido Popular Democrático—from the District Court of San Juan, and in turn transferred Judge Domingo Massari to the District Court of Guayama.

"11. That the Governor of Puerto Rico, being personally interested in the outcome of the present case upon the filing of this petition, has secretly made offers of promotion to Judge Belaval, which promises were accepted, there existing at present a formal agreement to the effect that when Mr. Jorge Luis Córdova ceases in his office as Judge of the District Court of San Juan, Judge Belaval will be appointed by the Governor to fill the vacancy.

"12. The petition for mandamus herein was filed before Judge Massari and said judge, on April 14, 1944, took cog-

nizance of the case and issued an alternative writ of mandamus setting the hearing for May 2, 1944.

"13. That prior to May 2, 1944, Mr. Massari was transferred to the District Court of Guayama.

"14. That the scheme carried out to bring Mr. Belaval to San Juan, the unjustified transfer of Mr. Massari to another court of the Island, after said judge had assumed jurisdiction and begun to act in the present case, as well as the appointment of Mr. Calderón to act for Judge Belaval in the District Court of Bayamón and the very transfer of Judge Belaval, all of this for the sole purpose of bringing said Judge Belaval to the post occupied by Mr. Massari in this court, is not at all in accordance with the statute or the administrative policy practiced for many years in Puerto Rico, this being the only time that a Governor of this island employs, for such manifestly offensive purpose, an unusual procedure to select a judge to sit in and decide a specific case.

"15. That the appointment of Mr. Enrique Campos del Toro as Attorney General of Puerto Rico has been strongly supported by the Governor, and said Enrique Campos del Toro, even though his appointment has not been confirmed, has in fact intervened and meddled in the affairs of the Department of Justice, aiding in carrying out those changes which serve the purposes of the Governor of Puerto Rico, it having been at the suggestion of said Enrique Campos del Toro that the Department of Justice acted and made the appointment and changes sought by the Governor of Puerto Rico in order to bring Judge Belaval to San Juan to substitute Judge Domingo Massari, Judge at Large.

"16. That recently and in order to make the appointment of Judge Belaval seem legal, the Governor of Puerto Rico has issued to him another commission as Acting Judge of the District Court of San Juan for an additional period to act this time, as he alleges, for Judge Jorge Luis Córdova Díaz, who is the incumbent of said office.

"17. That one of the rights granted to The People of Puerto Rico under the present government is that of representation in the Legislative Assembly, and the annulment of this prerogative on the part of the Governor of Puerto Rico, through his own actions which tend to violate our Election Law and to obstruct the administration of justice by favoring a scheme leading to an electoral fraud, involves a question of great importance and of high public interest.

"18. The intervenor alleges that the aforesaid transfer is illegal and contrary to law for the following reasons:

"(a) Because none of the Judges of the District Court of San Juan has asked Judge Belaval to hold a hearing in these proceedings.

"(b) Because when Judge Belaval was transferred to the District Court of San Juan to act for Judge Massari, the work of the District Court of Bayamón required his presence in that court, so much so that Mr. José M. Calderón was appointed to replace him temporarily, continuing, even now, as judge of said court, and Judge Massari was sent to the District Court of Guayama to act for Judge Barceló, who was neither ill nor absent from the Island, there being no well-grounded reason why Judge Massari should withdraw from his post and remain thus until the various proceedings for mandamus filed at the request of conspicuous leaders of the Partido Popular be prosecuted in San Juan and in the various districts of the Island.

"(c) That if the three judges who at present are acting in the District Court of San Juan should be unable to act in these proceedings by reason of their work, then the transfer of Judge Massari, immediately after the filing of the mandamus petition, is clerly improper, for which reason the action of the Governor is unreasonable and arbitrary, it being evident that said transfer hinders rather than promotes the public interest.

364

"(d) That the transfer of Judge Belaval from the District Court of Bayamón to the District Court of San Juan and that of Judge Massari to the District Court of Guayama, as well as the appointment of Judge Calderón to substitute Judge Belaval in the District Court of Bayamón, were carried out for the sole purpose of satisfying the personal and political interests of the Governor, who was acting as a conspicuous leader of the Partido Popular Democrático of Puerto Rico, in obtaining the intervention in these proceedings of a judge affiliated with the Partido Popular, whose transfer to this district had been carried out after a series of unusual and extraordinary changes for the main and sole purpose of having said Judge Belaval decide the important questions involved in these cases.

"19. That in view of the aforesaid circumstances, and there being involved in the present case the determination or questions of high public interest, it would serve the ends of justice if insted of Judge Belaval, or any other judge appointed by the Governor of Puerto Rico, taking part in these proceedings, the present case were submitted and tried by the three regular judges of this court, Hon. Marcelino Romany, Hon. R. La Costa Jr., and Hon. Ro. Cordovés.

"20. That the continuation of these proceedings before Judge Belaval, in view of the continuance of the Governor to have him take part as judge in these proceedings, as well as Judge Belaval's acceptance of this scheme, in addition to the other facts above set forth, constitutes a well-grounded reason to believe that the trial in the present case will not be held with the impartiality which should be accorded to the defendants and the intervener herein.

"THEREFORE, the intervener respectfully prays this court that Judge Emilio S. Belaval disqualify himself to act in this case, because his transfer to the District Court of San Juan was illegal and in view of the interest displayed by the Governor in these proceedings and the unjustified trans-

fers of the judges of the distrit courts of the Island for the purpose of submitting this case to Judge Belaval, there is ground to believe that a fair trial will not be had.

"The intervener likewise prays that once Judge Belaval is disqualified to act in these proceedings and in order to secure a most fair trial, the present action, which is one of great public interest, be submitted to the court in bank composed of its three regular judges, Hon. Marcelino Romany, Hon. R. La Costa, Jr., and Hon. R. Cordovés Arana, and that the court thus constituted dispose of the case as justice and law may demand.

"San Juan, Puerto Rico, May 9, 1944.—(Signed) Héctor González Blanes, Attorney for the Intervener."

It is further alleged in the petition for disbarment that the charges contained in the above-quoted motion to the effect that the Governor had promised Judge Belaval to appoint him Judge of the District Court of San Juan, on condition that he should decide the case in favor of the petitioners and that this promise was accepted by the Judge, are false and were made by the respondent without ascertaining their veracity and without having probable cause or any ground whatsoever to believe in the truth thereof; that said statements constitute scandalous matter and were made with the malicious intent of exposing the court and Judge Belaval, as well as the Governor of Puerto Rico, to the hatred and contempt of the community and of impairing their honesty, integrity, and reputation, by charging a public offense, all this in violation of the duties which the respondent, as attorney, owed said Court and Judge.

In his answer respondent admitted having filed the aforesaid motion; and he states that everything contained therein is true and that when he filed it as well as when he answered the petition for disbarment, he had ground or probable cause to believe said statements to be true; he denied that said motion contained scandalous matter, or that when he filed

it he did so with any malicious intent, alleging that his only intention was to comply with his duty, as an attorney, towards his clients.

By way of defense he alleged: (*a*) that this court lacks jurisdiction to entertain this disbarment proceeding; (*b*) that the petition does not state facts sufficient to constitue a cause of action; and (*c*) that if the petition filed against him should prevail, his rights, immunities, and the free practice of his profession would be impaired, as well as the necessary freedom which he must have in the faithful discharge of his professional duties before the courts, in the sense of not being restricted, restrained, or deprived of his duty of seeking, in the name of his client, the disqualification of a judge by frankly setting forth the grounds which *prima facie* and reasonably disclose that his client will not have an unbiased trial; all this in contravention of the provisions of the due process clause contained in the Fifth Amendment to the Constitution of the United States and of subdivision 1 § 2 of the Organic Act of Puerto Rico, approved on March 2, 1917.

The *Fiscal* and the respondent stipulated to submit the case on the evidence received at the investigation carried out by the Prosecuting Attorneys Gómez, Aponte, and Rodríguez Serra, adding to said evidence 16 documents marked Exhibits 1 to 16, inclusive, which inadvertently were not presented by the respondent to Prosecuting Attorney Gómez. It was further stipulated to wave their right to a hearing and to submit the controversy upon briefs which were filed.

I

The alleged lack of jurisdiction is predicated on the fact that the petition has been filed by the Assistant *Fiscal*, without said officer being designated by the Attorney General for that purpose. The respondent invoked § 13 of

Act No. 9 of March 11, 1909 [2] and § 2, subdivision (g), of the Act providing for the organization of the Bar Association of Puerto Rico (Act No. 43 of May 14, 1932):[3]

As we have previously pointed out, the Assistant *Fiscal* filed the petition by order of this court, which has inherent power to determine who may practice law in the insular courts, said power including that of disbarring those attorneys who by their conduct are unworthy to practice their profession. *In re Bosch, ante,* p. 232 (1945); *In re Arroyo,* 63 P.R.R. 764, 766 (1944); *In re Tormes,* 30 P.R.R. 248 (1922); *In re Claiborne,* 119 F. (2d) 647 (C.C.A. 1st., 1941); *In re De Caro,* 262 N. W. 132 (Iowa 1935); *In re Ulmer,* 167 N. E. 749 (Mass. 1929); *In re Gibbs,* 214 N. W. 850 (S. D. 1927); *In re Keenan,* 192 N. E. 65, 96 A.L.R. 79 (Mass. 1934).

It is true that the courts have upheld the validity of the legislation approved in aid of this inherent power, but when this legislation has tended to deprive or to impair the inherent right of the court, the latter has annulled such legislation, *In re Edwards,* 266 Pac. 665 (Idaho 1928); *Norfolk & Portsmouth Bar Ass'n* v. *Drewry,* 172 S.E. 282 (Va. 1934), but the laws invoked by the respondent do not impair this power of the court. The first of the Acts cited, imposes on the Attorney General or on any district attorney designated by him, the duty of prosecuting the charge and

---

[2] Section 13 of Act No. 9 of May 11, 1909, p. 96, provides as follows:

"It hall be the duty of the Attorney-General of Porto Rico, or of any district attorney by him designated, to prosecute all cases for the removal or suspension of attorneys and counsellors-at-law as aforesaid."

[3] Subdivision g of Section 2 of the Act providing for the organization of the Bar Association of Puerto Rico, reads thus:

"The Bar Association of Porto Rico shall have the power:

" * * * * * * *

"(g) To receive and investigate complaints in connection with the conduct of members practising their profession, which complaints may be forwarded to the Board of Governors for action; and after a preliminary hearing, at which the interested party shall be given an opportunity, if good cause is found, to institute proper disbarment proceedings in the Supreme Court of Puerto Rico. Nothing provided in this paragraph shall be understood to restrict or alter the power of the Attorney General of Porto Rico to institute such proceedings on his own initiative."

authorizes him to hold an investigation concerning the professional conduct of the attorneys. The second Act authorizes the Bar Association to investigate the complaints filed with regard to the professional conduct of its members and to institute the corresponding disbarment proceeding before the Supreme Court for sufficient cause. These Acts do not affect the power of this court to order, on its own initiative, without waiting for the filing of any complaint, an investigation of any matter concerning the conduct of its officers, such as attorneys, when the court has knowledge of improper conduct on their part which, in its, opinion, requires its intervention. *Matter of Bar Association of City of New York,* 222 App. Div. 580 (N. Y. 1928); *In re Tormes, supra; Randall* v. *Brigham,* 7 Wall. 523, 19 L. ed. 285 (U. S. 1868). And since the inherent power of the Supreme Court does not flow from the legislative power, the cause for disbarment does not necessarily have to be one of those defined in the statutes, provided that the attorney is granted an opportunity to be heard in his defense. *In re Tormes, supra; In re Maryland,* 45 P. (2d) 953 (Ariz. 1935); *Wood* v. *State,* 165 S.E. 908 (Ga. 1932); *In re Richards,* 63 S. W. (2d) 672 (Mo. 1938).

Evidently, it that power may be exercised by the court *sua sponte,* it may be delegated to any attorney, *In re Claiborne, supra,* and better still, to the Assistant *Fiscal* of this court, to file the complaint and prosecute it, especially when, as in the case at bar, the *Fiscal* of this court has abstained from acting.

## II

In order to determine whether the petition states sufficient facts, we shall take its allegations as true. We have briefly stated them and we have copied the motion for disqualification.

The oath taken by the respondent upon being admitted to practice law, compels him to have a respectful attitude towards the courts and the judicial officers, and the first Canon

of Professional Ethics, treating of the duties of the attorney towards the courts, among other things, provides:

"It is the duty of the lawyer to maintain towards the Courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance."

The cases of *People* v. *Gelpí,* 59 P.R.R. 36, and *Peña* v. *García,* 45 P.R.R. 42, are inapposite. In the former Attorneys Gelpí were prosecuted for contempt for the sole reason of having filed a motion for change of venue wherein, upon stating the grounds therefor, they made serious charges against the judge. Without giving an opportunity to the respondents to prove the truth of the facts alleged in their motion, the judge sentenced them for contempt of court and this court, upon reversing the judgment, stated at the close of its opinion:

"The respondents should have been given an opportunity to prove the facts alleged in their motion and, if the same turned out to be false and malicious, then action should have been taken against them in accordance with the law. If the allegations made in the motion turned out to be true, the plaintiffs in the action were entitled to request and obtain, on motion, the disqualification of the judge or the transfer of the case." (P. 44.)

In the petition for disbarment herein it is alleged that the facts averred in the motion for disqualification were set forth by the respondent without his having ascertained the truth thereof and without probable cause to believe that they were true.

The case of *Peña* v. *García, supra,* is inapposite because in the present case we are not discussing the merits of the motion for disqualification. The question involved herein is whether the respondent, as alleged in the petition, made such statements, without being certain of their correctness and without having ground or probable cause to believe in their truthfulness. If the facts alleged are true, and even if they

370

were not, if the defendant had ground or probable cause to believe that they were, and the motion was filed without malice but for the purpose of obtaining the impartial trial due every litigant, then the respondent would have to be acquitted; but this is a question of fact depending upon the result of the evidence. Therefore, we are of the opinion that the petition for disbarment is sufficient.

## III

■ The third defense does not merit a lengthy discussion. The freedom enjoyed by an attorney to defend his client and his statutory right to seek the disqualification of a judge when he has reasonable grounds to believe that his client will not have a fair trial, do not reach the point of permitting him to base his motion for transfer or disqualification on serious charges against the judge, without being certain of their truth or without having ground or probable cause to believe that the charges made are true. Like defense II, its success depends on the result of the evidence.

## IV

■ Having disposed of the questions of law, we shall pass on the merits of the case.

In the registrations held in Puerto Rico on the 15th and 16th of January 1944, there were filed 277,471 petitions for registration in all the Register Boards of the Island. Of this amount ·85.019 had certain alleged defects for which reason the Insular Board of Elections decided by a majority to declare them void. Against this decision the Partido Popular Democrático, Luis Muñoz Marín, Samuel R. Quiñones, and David Benjamín Cruz, filed in this court a petition for mandamus. They alleged, among other things, that of the 85,019 petitions 55,000 belonged to persons affiliated with·the Partido Popular Democrático who would be deprived of their right to vote if the decision of the Board prevailed. They prayed that the validity of the 85,019 petitions be upheld and

that the Board and the General Supervisor of Elections be accordingly ordered to treat them as they should other valid petitions.

At that time there existed in this court the same vacancy which still prevails and the court being equally divided, judgment was rendered on March 28, 1944, denying the petition for mandamus. *Popular Party* v. *Insular Board of Elections*, 63 P.R.R. 284.

Turning to the decision of the Insular Board of Elections, it is worthy of note that the vote of the representative of the Partido Liberal Puertorriqueño was the controlling vote for the rendition of said order, since the representatives of the Partido Unión Republicano Progresista, the Partido Socialista, and the Partido Liberal Puertorriqueño voted against the validity of the petitions; and the Partido Popular Democrático voted in favor of it, the General Supervisor of Elections refusing to vote. But shortly after this ruling was made and prior to March 12, 1944, Mr. Dubón resigned as representative of the Partido Liberal in the Insular Board of Elections. Of course, if the successor of Mr. Dubón should not share his opinion with respect to the validity of the petitions, a reconsideration might be sought at a meeting of the Board and another decision rendered instead tending to make valid the 85,019 petitions, [4] notwithstanding the judgment of this court denying the writ of mandamus.

While the Governor was considering the appointment of the representative of the Partido Liberal, Senator Iriarte, according to his testimony before Prosecuting Attorney Gómez, stated in the presence of Senator Muñoz Marín, leader of the Partido Popular and President of the Senate, that the latter was responsible that those voters should lose

---

[4] If the new representative of the Partido Liberal should vote in favor of the validity of the petitions, the votes of the four representatives of the parties would be equally divided. In the event that the General Supervisor should refuse to vote, the vote of the Governor would be controlling. Section 36 Election Law.

their votes, inashmuch as he (Iriarte) and Dr. Figueroa had asked him to introduce amendments to the Election Law, in order to validate the petitions for registration of those who were entitled to vote, and Mr. Muñoz Marín had done nothing to that effect. Mr. Iriarte further stated that Senator Muñoz Marín, in the presence of Messrs. Teófilo Maldonado, Samuel R. Quiñones, and Susoni had answered that he (Muñoz Marín) would arrange matters administratively.[5] Senator Iriarte further testified that on the following day, that is, on March 30, 1944, the Governor appointed Mr. G. Cruzado Silva, who did not share the opinion of Mr. Dubón, as representative of the Partido Liberal in the Insular Board of Elections, and Mr. Ernesto Micres Calimano as alternate.[6] These gentlemen had been recommended to the Governor by Mr. José Ramírez Santibáñez, President of the Partido Liberal at that time, in open violation of the resolution adopted by the Central Board of said Party which was the only one legally empowered to make such recommendation. The Board had recommended Messrs. Luis Archilla and José E. Gelpí, the former having publicly announced that he shared Mr. Dubón's opinion.[7] Messrs. Archilla and Gelpí filed a

---

[5] Senator Muñoz Marín in an affidavit sworn before the Assistant *Fiscal* of the Supreme Court, on March 8, 1945, while referring to the statements with which Senator Iriarte had charged him, stated: ''I do not quite recall the conversation to which Senator Iriarte refers. Perhaps we were speaking about the emergency work and not about the situation of the 85,000 voters. As to the emergency plan the Government spared no efforts, administratively, to keep it going for the benefit of the unemployed. But I am not quite sure of this; may be we were talking about the 85,000 voters. Of what I am absolutely sure is that it was never my intention, while speaking of administrative remedies, to refer in any way to the transfer of judges. Of course, I did not have in mind the transfer of judges. Such is not my way of acting. . .''

[6] It seems pertinent to state here that Mr. Rodríguez Pacheco testified to the effect that on the evening of March 30 he had a telephone conversation with Governor Tugwell, asking the latter to appoint Messrs. Archilla and Gelpí who had been recommended by the Central Board, and that the Governor informed him that he had already signed the commissions in favor of two other persons (the Governor did not recall the names) and then asked Rodríguez Pacheco: ''Are you also against Don Pepe?'' meaning Mr. José Ramírez Santibáñez, then President of the Partido Liberal.

[7] Issue of the newspaper ''El Mundo'' corresponding to March 15, 1944.

petition for mandamus in this court to compel the Governor to appoint them, whereupon, deciding the case on its merits, the petition was granted and a peremptory writ issued ordering the Governor to appoint them, with which the Governor complied. *Archilla* v. *Tugwell, Governor,* 63 P.R.R. 397.

A few days later, about April 10, 1944,[8] several suits, substantially identical with that of *Popular Party* v. *Board, supra,* were instituted in all the district courts of the Island in the name of persons who resided in those districts respectively, and whose petitions for registration had been annulled by the decision of the Board. The one filed in the District Court of San Juan was brought in the name of Luisa Boix Domínguez *et al.* The case was to be heard in the Third Section of the District Court of San Juan which was at that time presided by Mr. Massari, District Judge at Large, acting for Judge Córdova, during the latter's leave of absence. One of plaintiff's attorneys presented the mandamus petition and a draft of the alternative writ to Judge Massari, but the latter refused to sign the alternative writ immediately and stated that he had to study the matter carefully before rendering any decision. After considering the case and having expressed certain doubts as to whether or not he should deny the petition flatly because in his opinion it involved a case already decided by the Supreme Court, he decided to issue an order summoning the parties to inform as to whether or not the remedy sought would lie. He signed this order but did not carry it out because Andreu Ribas, clerk of the Court, who knew the mind of the Judge, immediately called on Mr. Samuel R. Quiñones, another of petitioner's attorneys, who then sent a message through the clerk to the Judge asking him to hold his decision until said attorney could discuss the matter over with him. On the next day, they had an interview wherein said attorney con-

---

[8] In accordance with the testimony of Mr. Andreu Ribas, Clerk of the District Court, both the mandamus petition and the draft of the alternative writ were in the office of Judge Massari since April 10, the petition having been filed on the 12th.

vinced him that he could sign the alternative writ and later set it aside if he were convinced that it did not lie. In the late hours of the morning of April 14, the Judge signed the alternative writ and set the hearing of the case for May 2, following. A few hours later Judge Massari received an order from the Department of Justice transferring him to the District Court of Guayama to act for Judge Barceló, to whom leave had been granted. In order to substitute Judge Massari in the District Court of San Juan, Judge Belaval, of the District Court of Bayamón,[9] although at that time, according to his own testimony, he had several cases pending his decision, some of which were of great importance and urgency. In order to substitute Judge Belaval in the District Court of Bayamón, Attorney José M. Calderón was appointed temporarily.

During those days Judge Massari was recovering from a long illness, for which reason he insisted with the Acting Attorney General and Mr. Campos del Toro[10]—whose ap-

[9] The commission of Judge Belaval was signed by Governor Tugwell on Saturday, April 15, 1944.

[10] From his office of Coordinator in Fortaleza, Mr. Campos del Toro intervened, to a large extent, in the direction of the Department of Justice. Exhibit EX pp. 125 to 142 and letter of Mr. Borinquen Marrero, of September 6, 1944, addressed to Judge Belaval, Exhibit 12 JCA, which reads:

"September 6, 1944, Hon. Emilio S. Belaval, District Judge, 14 Estado St. (Miramar), Santurce, P. R.—My dear friend and colleague:—According to our telephone conversation of today, I wish to ratify that I recall perfectly well that Mr. Enrique Campos del Toro called me up on the afternoon of April 18, 1944, at my office in the Legal Division of the Treasury Department. In compliance with his wishes I went to the Office of Attorney Campos del Toro in Fortaleza and there he asked me whether I was willing to accept the position of Acting District Judge of Guayama, during Judge Barceló's vacation, beginning on Monday, April 24. He also asked me if in case the Office of District Judge of Guayama should vacate, by reason of Judge Barcelo's resignation, who would be appointed Assistant Attorney General, would I be willing to accept the office of Judge of Guayama. I answered both questions affirmatively and upon receiving my commission from the Governor of Puerto Rico I acted as Judge of the District Court of Guayama from April 24 to June 27, inclusive.

"Later, as it is of common knowledge, when Attorney Barceló was appointed President of the Public Service Commission, I was appointed District Judge of Guayama.—Sincerely yours, (Signed) B. Marrero Ríos."

pointment as Attorney General of Puerto Rico was pending confirmation by the Senate of the United States—not to be sent to Guayama but all his efforts were useless. He was told that he would go to Guayama for a few days, and this was really the truth. The first able day to act as Judge of the District Court of Guayama was Tuesday April 18 and on that day he left for Guayama together with Judge Barceló. But on that same day, however, the Acting Attorney General recommended to the Governor the appointment of Mr. Borinquen Marrero as Acting Judge of the District Court of Guayama, whereupon the Governor issued the commission two days later, Judge Marrero qualifying for said office on April 21. Judge Massari returned to San Juan on April 22 and remained in the office of the Attorney General until May 7, 1944, on which date he was sent to Ponce. It is evident that if Judge Marrero was going to be recommended on April 18, that is, on the same day that Judge Massari left for Guayama, what useful purpose was attained by transferring him from the District Court of San Juan almost immediately after having signed the alternative writ of mandamus and after having expressed serious doubts as to its propriety? [11]

---

[11] As to the need for these transfers of judges we copy from the testimony of Acting Attorney General Rodríguez Ramos, who ordered the transfer of Judge Massari, the following:

"Q.—Therefore, Mr. Rodríguez Ramos, if we should ask you or if I should directly question you as to the need of transferring Judge Massari to the District Court of Guayama, what would your answer be? A.—There was no need whatsoever.

 *         *         *         *         \ *         *         *

"Q.—There was practically no need or reason whatsoever for transferring Judge Massari to Guayama and Judge Belaval to San Juan. A.—There was no real need for it.

"Q.—The service did not require it? A.—Undoubtedly not. Exhibit EX pp. 72 and 73-4.

And from the testimony of Mr. Campos del Toro we copy the following:

"Q.—Very well with respect to Mr. Barceló of the District Court of Guayama. Why did you consider it necessary that in order to substitute Judge Belaval, I mean, Barceló in Guayama, Judge Massari, who was acting in San Juan in substitution of Judge Córdova Díaz, had to be transferred? A.—The reason for that is easily understood, it is the following: Attorney Calderón, Mr.

But this is not all. It seems natural and rational that if the real purpose of transferring Judge Massari was merely to act for Judge Barceló, when Judge Marrero was appointed for Guaama, and Judge Massari returned to San Juan, the latter should again have taken charge of the District Court of San Juan, as Judge at Large in substitution of Judge Córdova, that is, the same status which existed when the alternative writ was signed should have been re-established, for, as we have already pointed out, Judge Massari remained in San Juan until May 7. If Judge Massari would have re-

---

Barceló's candidate for the office of Acting Judge of Bayamón, had never had any experience as District Judge and besides he resided in Santurce. In view of these circumstances it was not advisable to appoint Attorney Calderón as Acting Judge of San Juan in substitution of Judge Córdova Díaz, because of his lack of experience and because it has been the policy of the Department of Justice that Attorney Calderón should not begin his practice in the District Court of San Juan which is the most important court in Puerto Rico, and then it was believed that since Mr. Massari is Judge at Large and exercises his duties in all the Island and is transferred from one district to another as District Judge at Large, that there would be no inconvenience in transferring Judge Massari to Guayama, Attorney Calderón to Bayamón, and Judge Belaval to San Juan, where Judge Calderón has his residence, that the latter would be in a better position and would not object to accepting the office on the ground that it was far away from his domicile and Judge Calderón would be able to come to his home every afternoon. Q.—Is it true that Judge Massari is the District Judge at Large, but that he was acting in San Juan? A.—Yes, Sir. Q.—And does Judge Massari reside in San Juan? A.—Yes, Sir. Q.—And why does the witness think that it would be inconvenient for Judge Calderón to go to Guayama? Why could not Judge Calderón be sent to Guayama and Massari left in San Juan? A.—First, because Attorney Calderón had told Judge Barceló that he would not accept going to Guayama and, secondly, because in so far as Judge Massari is concerned, it was his duty to go wherever the Attorney General ordered him because according to the law creating said office, he is bound to discharge his duties throughout the whole Island, and as regards Attorney Calderón, he was not legally bound to render such services but he accepted to render them taking the opportunity offered him to get experience as district judge. Q.—You have stated that it was Judge Massari's duty to go wherever the Department ordered him. That is all right, but now we are not investigating and we are not trying to investigate the duties of Judge Massari. We wish to know whether at that time there was pressing need of transferring Massari from San Juan to Guayama. A.—I wish to state, in answer to your questions, that what I am trying to explain is the reason why, in my opinion, Judge Barceló suggested the transfer of Mr. Belaval and asked for his own leave of absence from the District Court of Guayama." Exhibit X, pp. 158–161.

turned to the District Court of San Juan, Judge Belaval' would have gone back to the District Court of Bayamón, where he could have disposed of all the important and urgent matters which he had left pending.

But things did not happen as were expected. Judge Belaval continued as Acting Judge of the District Court of San Juan and on May 2 another commission was signed in his favor, thereby enabling him to sit in the mandamus case which had been set by Judge Massari for May 2, 1944.

On May 9, when the case was finally called for trial, the respondent, as attorney for the intervener, Progressive Union Republican Party, filed the motion for disqualification copied above and prayed that said motion be heard and disposed of before commencing the trial. The judge consented to hear the motion but after it was read by the respondent, upon the latter stating that he intended to use the testimony of Judge Belaval, of Mr. Campos del Toro and of others, the following took place:

"The Court: . . . Now as to this motion for disqualification, which I shall flatly deny, this court wishes the following statements to be entered in the record:

"Att'y González Blanes: May it please the court. If your Honor is going to make statements about facts which are known to your Honor, I wish that an opportunity be given us to offer evidence regarding any question of fact which your Honor might enter in the record.

"The Court: After I have finished, then we shall go into that matter. It is well known in Puerto Rico that Mr. Enrique Campos del Toro has been appointed Attorney General. It is a known fact in Puerto Rico that Attorney Antonio R. Barceló, Judge of the District Court of Guayama, will be appointed First Assistant Attorney General. Immediately after the appointment of Mr. Enrique Campos del Toro was announced, I was called to a meeting at the home of Attorney Enrique Campos del Toro, where the latter, Judge Barceló, and myself were present. I was asked there if in my opinion it would prejudice Antonio R. Barceló to resign his post and receive the appointment of Assistant Attorney General, Attorney Enrique Campos del Toro having made up his mind to appoint Judge Barceló

First Assistant Attorney General of Puerto Rico. The problem then arose that Judge Barceló had to take leave in order to dispose of the cases he had pending, in order to take charge of the office of First Assistant Attorney General. It was there discussed which of the two, whether Judge Massari or myself, should go to Guayama, and it was decided that since he was the judge at large, he should be transferred to Guayama.

"Then, when the filling of the vacancy existing in San Juan was considered, I was asked if I thought I could be appointed, that the Department of Justice was considering my name for a permanent appointment, if, as was expected at any time, Judge Córdova Díaz were promoted to the Supreme Court. We discussed the matter over. I set forth my arguments as to what I was to do, the time I needed for the new combination. That evening Mr. Campos del Toro informed that Judge Córdova's appointment was expected at any time, that at least that was the impression he got in Washington. Then Judge Calderón was sent to Bayamón because in the event Judge Jorge Luis Córdova is promoted to the Supreme Court and I am appointed to the District Court of San Juan, Judge Calderón will most probably be appointed permanently Judge of the District Court of Bayamón, and Attorney Borinquen Marrero was appointed to Guayama, as in all probability the latter will be appointed judge in said district.

"Of course, this was an informal conversation and the Attorney General may change his mind if he deems it advisable, but I have come to this Court under the impression that if Judge Jorge Luis Córdova is appointed to the Supreme Court, I shall immediately be appointed, at least, the Attorney General will recommend me, as Judge of the District Court of San Juan.

"After entering these statements in the record, and that is all I wanted to state, it seems to me that the motion operates as a moral compulsion on this court and I, as Judge, will not tolerate it and, therefore I hereby deny it." *Insular Board of Elections* v. *District Court*, 63 P.R.R. 876, 793.

## V

This was not the proper way of deciding said motion. It contained a serious charge against a judge, and by silencing the accuser the charge was not destroyed. But, moreover, the intervener was entitled to have his case decided by an impartial judge and this circumstance and the situation in

which, either consciously or unconsciously, the judge had placed himself, imperatively demanded that the intervener be granted a reasonable opportunity to present the evidence which it offered.[12] If it succeeded in proving the allegations of its motion its right to a fair trial and to the disqualification of the judge would be recognized. But, on the other hand, if it failed to prove them, the doubt cast by the charges made would be dispelled. As stated in *State ex rel. Barnard* v. *Board of Education,* 19 Wash. 8, 18:

"Caesar demanded that his wife should not only be virtuous, but beyond suspicion; and the state should not be any less exacting with its judicial officers, in whose keeping are placed not only the financial interests, but the honor, the liberty and the lives of its citizens, and it should see to it that the scales in which the rights of the citizens are weighed should be nicely balanced, for, as was well said by judge Bronson in *People* v. *Suffolk Common Pleas,* 18 Wend. 550: 'Next in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge.'"

It should be stated that there is no evidence as such in the record to support the charge of bribery made by the respondent against Governor Tugwell, said offense consisting in having made to Judge Belaval secret offers of promotion as Judge of the District Court of San Juan on condition that the latter should decide the case in question in favor of the plaintiffs. Likewise, there is no evidence whatsoever as such against Judge Belaval supporting the charge of having accepted the bribe. We are of the opinion that, although the respondent exceeded himself in making the charge of bribery against both officers, which action we disapprove, nevertheless, all the facts which we have stated in

---

[12] There is no doubt that the respondent was clearly entitled to introduce evidence in aid of his motion. *Insular Board of Elections* v. *District Court, supra,* p. 794. The failure to hear him is more efficient, as a means to exact the a clever examination at the right time is more efficient, as a means to exact the truth, than testimony of the same witnesses taken *ex parte* several months after said crucial moment.

detail in this opinion and the surrounding circumstances of this case do not justify that the respondent be reprimanded in any manner whatsoever.

The petition for disbarment must be denied.